*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFFREY D. HILL,

>
> *Petitioner-Appellant,*
>
> *v.*
>
> No. 03-4132
>
> BETTY MITCHELL, Warden,
>
> *Respondent-Appellee.*
>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00382—James L. Graham, District Judge.

Argued: November 4, 2004

Decided and Filed: March 8, 2005

Before: GIBBONS, ROGERS, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gary W. Crim, Dayton, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Gary W. Crim, Dayton, Ohio, Timothy R. Payne, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. A state-court jury imposed a capital sentence on Jeffrey Hill for the aggravated murder of his mother, and Hill now challenges a district court decision denying his petition for habeas corpus relief. Among a host of other claims, Hill emphasizes that his lawyers' failure to hire a mitigation psychologist until the day before the mitigation hearing constituted ineffective assistance of counsel. Even assuming that the delay in hiring this psychologist amounted to objectively defective lawyering, we agree with the district court that Hill has not shown that the delay prejudiced the penalty phase of his trial—first because the mitigation theory that the psychologist did present (that Hill was suffering from cocaine psychosis at the time of the murder) did not differ in material ways from the one that would have been presented with more preparation and, second, because nine psychological and background assessments of Hill had already been undertaken by the time the mitigation psychologist had been hired and all of them were submitted to the jury during the sentencing hearing. Because we reject this claim and Hill's other claims as well, we affirm.

1

I.

Early in the morning on March 23, 1991, Jeffrey Hill, then 26 years old, visited his mother, Emma Hill, at her apartment. He borrowed $20 from her (under the pretext of needing money to buy cigarettes), left the apartment and bought some crack cocaine (even though he had consumed nearly $400 worth of crack cocaine the preceding night).

When he returned within the hour, his mother, who was partially paralyzed from a stroke, complained that he did not visit her regularly. An argument between the two ensued and eventually ended when Hill stabbed his mother ten times with a kitchen knife. According to Hill's later confession, his mother said, "Why? Why did you do this?" as she lay dying on the floor next to her bed. JA 1161. Hill did not respond and instead searched her belongings for more money that he could use to buy crack. Finding another $20, Hill left his mother in the apartment, locked the door behind him and drove away in his mother's car. After disposing of the knife, he smoked more crack cocaine and, at some point along the way, met a friend, Charlotte Jones.

That evening, Hill returned to his mother's apartment, leaving Jones waiting in the car after telling her that he was stopping off to get some money from his mother—although he later testified that he returned "to see if she [his mother] was all right." JA 1161. Having forgotten to take the key with him when he locked the apartment, he forced the door open, went into her closet and took the $120 he found there.

Later that night, a police officer stopped Hill for driving without lights. Spotting a crack cocaine pipe next to the driver's seat and eventually learning that Hill lacked a license and had an outstanding arrest warrant, the officer took Hill into custody. Two days later, the police found Emma Hill's body in her apartment. When homicide detectives questioned Hill about his mother's death, Hill initially denied knowing about her death but, after being confronted with inconsistencies in his statements, confessed to the murder. Further investigation corroborated Hill's confession: The police found a bloodstained knife where Hill confessed he had abandoned it; the wounds proved to be consistent with ones that would be made by the knife; and money found in the car carried blood stains consistent with Emma Hill's blood type.

A grand jury indicted Hill, charging him with aggravated murder during a robbery (count 1), aggravated robbery (count 2), aggravated burglary (count 3) and theft of a motor vehicle (count 4). When Hill expressed an interest in raising an insanity defense, the trial court appointed psychologists to evaluate him. After these evaluations, the Ohio trial court found Hill competent to stand trial, and the three psychologists who evaluated him for insanity each concluded that at the time of the murder he did not lack the ability to know right from wrong or to refrain from the act had he chosen to do so. Hill abandoned the insanity defense and argued his innocence at trial. At the end of the guilt phase of the trial, a jury convicted him on all counts.

At the mitigation hearing, Hill's counsel presented testimony from four witnesses designed to persuade the jury to give him a life sentence rather than a death sentence. His mitigation psychologist, Dr. Myron Fridman, testified that Hill's cocaine addiction and intoxication affected his actions at the time of the murder. Dr. Fridman testified that Hill was addicted to cocaine at the time of the murder and that crack addicts who consume large amounts of cocaine may enter a mental state called cocaine psychosis in which they become irrational, violent and aggressive. Dr. Fridman also testified that Hill would be a good candidate for rehabilitation because he would not have access to cocaine in prison. And Hill's counsel submitted into evidence nine reports detailing Hill's mental health and describing various aspects of his family history, all of which Hill supplemented by testifying himself during the sentencing hearing.

When asked at the sentencing hearing if he remembered stabbing his mother, Hill answered, "Not really," JA 1163, but his testimony otherwise corresponded to his earlier confession. After the sentencing hearing, the jury recommended that Hill be sentenced to death, concluding that the aggravating

circumstance—committing murder during an aggravated robbery—outweighed the mitigating factors presented by Hill. The trial court accepted the jury's recommendation.

Represented by new counsel, Hill appealed his conviction and sentence to the Hamilton County Court of Appeals, *see State v. Hill*, No. C-920497, 1993 WL 538902 (Ohio Ct. App. Dec. 22, 1993), and to the Ohio Supreme Court, *see State v. Hill*, 653 N.E.2d 271 (Ohio 1995), but each court affirmed the jury's verdict and the death sentence. After the United States Supreme Court denied his petition for a writ of certiorari, *Hill v. Ohio*, 516 U.S. 1079 (1996), Hill sought post-conviction relief in the state courts. The court of common pleas rejected each of Hill's post-conviction claims, and the Hamilton County Court of Appeals affirmed. *State v. Hill*, No. C-970650, 1998 WL 320917 (Ohio Ct. App. June 19, 1998).

After the Ohio Supreme Court declined to exercise discretionary review, *Ohio v. Hill*, 700 N.E.2d 878 (Ohio 1998), Hill filed a habeas corpus petition in federal district court, asserting 20 grounds for relief ranging from ineffective assistance of counsel to prosecutorial misconduct to assorted errors by the state trial court. In two separate opinions, the district court denied the writ of habeas corpus, concluding that all of Hill's claims either failed on the merits or were procedurally defaulted. Hill now brings this appeal.

II.

Hill argues, first and foremost, that his attorneys' failure to hire a mitigation psychologist until the day before the mitigation hearing violated his right to counsel under the Sixth (and Fourteenth) Amendment. We disagree.

When a constitutional claim reaches us on a petition for habeas corpus, the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), ordinarily limits our review of the relevant state-court rulings. "[W]ith respect to any claim that was adjudicated *on the merits* in State court proceedings," AEDPA permits federal courts to grant habeas relief in only two instances: (1) if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (emphasis added). But when a claim has not been "adjudicated on the merits in State court proceedings," *id.*, and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

The Ohio Court of Appeals spoke to the mitigation-psychologist claim in this way:

> Hill claims in his fourth assignment of error that he was denied effective assistance of counsel because counsel only contacted Dr. Fridman, the addiction specialist who testified during the mitigation phase of Hill's trial, a day before he testified. Hill proffered Dr. Fridman's affidavit in the court below; it stated that he had been contacted after the guilt phase of Hill's trial, that he did not meet Hill until the morning he testified, and that had he evaluated Hill earlier, he could have done an evaluation of Hill and testified specifically about Hill and his addiction as opposed to addiction in general. Hill also referred to the affidavit of Dr. Hawgood as an example of the type of testimony which could have been presented to the jury had Dr. Fridman been contacted earlier. The record demonstrates that Dr. Fridman was contacted one day before he testified. While we are puzzled by counsel's seeming inattention, Hill's claim is *res judicata* because it could have been raised on direct appeal.

*State v. Hill*, 1998 WL 320917, at *3. Thus, while Hill presented this claim to the state courts on collateral review, they declined to reach the merits, reasoning that because he could have raised the issue on direct appeal (but had not), res judicata barred consideration of the claim.

The district court concluded that this procedural ruling did not bar habeas review of the underlying constitutional claim. Reasoning that ineffective-assistance claims are not barred by res judicata under Ohio law when evidence outside the direct-appeal record is presented, the district court decided—in harmony with *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (concluding that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded")—that Hill "was not required to raise this claim on direct appeal and that this claim is properly before the Court for a merits review." D. Ct. Op. (Jan. 17, 2001) at 17. The district court, accordingly, gave de novo review to this claim on its merits, and so do we.

In giving de novo review to the merits of Hill's constitutional claim, we apply the familiar framework for analyzing ineffective-assistance-of-counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show ineffective assistance of counsel, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). And to establish prejudice, a petitioner must "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 534 (quoting *Strickland*, 466 U.S. at 694). In the context of a death sentence, the question of prejudice turns on "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

In this case, the State has not argued that Hill's lawyers performed effectively, and the district court assumed that his lawyers had not performed adequately in hiring Dr. Fridman one day before the mitigation hearing. The question under these circumstances is whether Hill has demonstrated that his attorneys' deficient performance prejudiced him. Like the district court, we do not believe that their tardiness in hiring a mitigation psychologist prejudiced Hill.

*First*, this is not a case in which expert psychologists did not have an opportunity to examine Hill until the eleventh hour. Before Hill's mitigation psychologist, Dr. Fridman, testified at the mitigation hearing, numerous other psychologists had already evaluated Hill at various times to determine his competency to stand trial and to determine his appreciation of what he was doing at the time of the assault. In determining that Hill was competent to stand trial, the trial judge heard the testimony of five mental health experts who had assessed Hill's competence, at least three of whom were psychologists who had each interviewed Hill twice. During these evaluations, Hill claimed to hear voices speaking to him, but the psychologists concluded that he was malingering, contriving these hallucinations to avoid having to stand trial. In addition to these competency examinations—which took place between July and September 1991—and in addition to a concurrent period of treatment for Hill at the Dayton Mental Hospital Forensic Unit, the trial court also ordered additional evaluations concerning Hill's mental status at the time of the offense. In response to this order, the same three psychologists who had already interviewed Hill twice regarding his competency each interviewed him a third time (in February 1992) to reassess him in light of his not-guilty-by-reason-of-insanity plea. Following these evaluations by court-appointed mental health experts, Hill's attorneys moved in March 1992 for funds for a mitigation specialist, but—although presented the opportunity to suggest an actual specialist during a hearing—apparently did not follow up on hiring the mitigation specialist until the jury found Hill guilty on June 1, 1992.

As this chronology illustrates, when Hill's attorneys finally retained Dr. Fridman on June 3, 1992, the day before the mitigation hearing, they were not suddenly asking a psychologist to examine Hill for the first time. Extensive examinations of him had already been done. And during the penalty phase and mitigation hearing, Hill's attorneys introduced into evidence nine reports examining his mental health. *See Smith v. Mitchell*, 348 F.3d 177, 185, 188, 200 (6th Cir. 2003) (finding no prejudice where, after a number

of psychologists examined defendant for competency and sanity, one of those psychologists was later appointed as a mitigation specialist and prepared her mitigation report the same day she testified, relying primarily on records she had received from her earlier examinations); *id.* at 200 ("We find no cause or prejudice under *Strickland* because *all of this evidence was presented at mitigation*. As exhaustively detailed above, virtually all of the mitigating elements that [the defendant] complains of were presented via [the court-appointed expert's] testimony and her mitigation report."); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001) (finding no prejudice where "the evidence [the defendant] claims should have been introduced goes to a theory of mitigation that the jury found did not outweigh the aggravating circumstances").

*Second*, despite the hiring delay, Dr. Fridman testified at the mitigation hearing that he conducted his evaluation of Hill in much the same way that he normally would have evaluated a patient: He considered available historical documentation and events; he reviewed seven prior reports put together by the other psychologists who had examined and interacted with Hill; and he interviewed Hill. In addition to his extensive pre-existing knowledge of the impact of a crack-cocaine addiction on behavior, in other words, Dr. Fridman considered all of the same sources for applying the mitigation theory to this case that he would have considered had he been given more time. *See Smith v. Mitchell*, 348 F.3d at 188, 200 (finding no prejudice where mitigation expert relied on earlier reports addressing competency and considered the same types of sources Dr. Fridman considered here).

*Third*, Dr. Fridman's testimony at the hearing fairly presented a crack-addiction-psychosis theory of mitigation, and Hill has not shown how that testimony was materially different from the testimony he would have presented had he been given more time to prepare for the hearing. Dr. Fridman testified that crack use can cause "a very, very intense addiction [ ] with a compulsive behavioral need to continue to use the drug." JA 3345. Users who consume high doses of crack cocaine over a period of time, Dr. Fridman continued, may enter "a mental state that has been called cocaine psychosis . . ., which is characterized by mental confusion, irrational behavior" and paranoia. JA 3346. When a crack addict comes off a period of heavy use, Dr. Fridman told the jury, he can enter "abstinence syndrome," a condition in which "a crack addict is often capable of behaving and doing anything to get [his] drug, [including] behaving in very irrational ways. They can certainly be violent, aggressive." JA 3347.

After laying this foundation, Dr. Fridman gave his opinion, formed to a reasonable degree of professional certainty, that Hill was addicted to cocaine at the time of the murder and had been so addicted for some time before that. After characterizing Hill as a long-term addict, Dr. Fridman repeated that an addict "who has just binged on a lot of crack" and who has abstinence syndrome "can be directed by his need, his overwhelming intense need for more of the drug." JA 3350.

This testimony presented the mitigation theory that Hill's cocaine addiction and cocaine use played a pivotal role in his behavior at the time of the murder. At the same time, Dr. Fridman testified, to a reasonable degree of professional certainty, that Hill would be a proper candidate for rehabilitation if he were placed in jail for the rest of his life. All of these factors considered, Dr. Fridman's late hiring did not undermine Hill's efforts to present this mitigation theory to the jury. *See Hicks v. Collins*, 384 F.3d 204, 213–15 (6th Cir. 2004) (finding no prejudice where counsel relied on a court-appointed psychologist who testified only about cocaine intoxication and not about cocaine psychosis, instead of retaining a separate expert to do so, and where evidence of guilt was so overwhelming that even if the jury had heard about cocaine psychosis, the result would not have changed); *Williams v. Coyle*, 260 F.3d at 706 (finding no prejudice in counsel's failure to present additional evidence on a mitigation theory that the jury heard a version of and found did not outweigh the aggravating factors).

Attempting to rebut this conclusion, Hill argues that affidavits by a psychiatrist, Dr. Gary Sales, and by a psychologist, Dr. Julia Hawgood, demonstrate how a properly prepared expert could have (and should have) testified. But the two affidavits offer testimony that does not differ in substance from Dr. Fridman's

testimony, that at best differs from Dr. Fridman's testimony at the margins and that does not suffice to create a reasonable probability that the jury would have been swayed to see the issue differently.

Dr. Sales' affidavit, for example, indicates that Hill was addicted to and intoxicated by cocaine at the time of the murder. But Dr. Fridman's testimony covered that ground when he testified that Hill was a cocaine addict and that an addict who had just binged on the drug would have an "overwhelming intense need for more" crack. JA 3350. As Hill admitted he had consumed $400 worth of crack the previous night and had consumed more crack shortly before stabbing his mother—that, in short, he had just binged on cocaine—it is difficult to see how Dr. Fridman presented a conclusion that differed in any material way from Dr. Sales' proposed conclusion. Dr. Sales' affidavit also describes the physiological and chemical effects of cocaine in an effort to explain how cocaine use influences behavior. But, again, Dr. Fridman's testimony did the same, albeit in a more abbreviated fashion, when he explained how cocaine use changes behavior, leading to violent, aggressive, paranoid and irrational tendencies. And while Dr. Sales describes Hill's mother as emotionally distant and authoritarian, a fact that Dr. Fridman did not address, the jury learned this information through the earlier psychological reports admitted into evidence. Moreover, Dr. Sales' conclusion that Hill's relationship with his mother was good and had improved since his father's death would not necessarily have advanced Hill's cause. Emphasizing that Hill had developed an increasingly healthy relationship with his mother just before killing her risked doing more harm than good for his position.

Also unavailing is the argument that Dr. Hawgood's affidavit provided information materially different from Dr. Fridman's expert testimony. While the Hawgood affidavit provides more information about Hill's and his mother's background than Dr. Fridman did, Hill fails to explain why this additional information would have been likely to persuade a jury to give him a life rather than a capital sentence and why at any rate its absence from Dr. Fridman's testimony affected the jury's deliberations given that much of this background information was in the nine psychological reports presented to the jury during the penalty and mitigation phases of the case. The information about the difficulties Hill's mother experienced during her upbringing—that her parents divorced when she was young, forcing her to act as a parent to her younger siblings—risked creating more sympathy for the victim than for Hill. And most of the information in the Hawgood affidavit describing Hill's mother as controlling and authoritarian—subjecting Hill and his brother to "harsh physical punishment and verbal humiliation," including beating them with electrical cords and a belt, locking the refrigerator door during certain hours of the day and removing locks from the boys' doors to make it easier for her to inspect their rooms—was included in the nine psychological reports submitted in the penalty and mitigation phases. JA 334 (describing discipline with belts and extension cords), 389 (concluding Hill was "the product of a very troubled, dysfunctional family"), 395 (reporting that Hill's "mother was at times abusive and demeaning to Mr. Hill"). Dr. Hawgood also described the profound impact that the death of Hill's father had on Hill, but this too was presented through the nine psychological reports. Indeed, Hill himself testified during the mitigation hearing that the death of his father led him to turn to crack. JA 385 (recounting that Hill said his father remained "[his] best friend" and that "it was emotionally very distressing to him when [his] father died of cancer in 1991"), 3306–07 (Hill testifying that he started smoking crack when his father died, that he felt lost and hurt by his father's death and that he turned to crack because he thought it would solve his problems). In the end, the Hawgood affidavit either (1) echoed points about Hill's and his family's background that were already covered in other mitigation evidence or (2) related to Hill's cocaine addiction and concerned Hill's psychological state at the time of the murder—points effectively presented by Dr. Fridman's actual testimony. *Compare Wickline v. Mitchell*, 319 F.3d 813, 821–22 (6th Cir. 2003) (finding no prejudice where counsel did not present any evidence of defendant's allegedly troubled upbringing, including "devastat[ing]" death of one parent and troubled relationship with other parent).

Doubtless, Dr. Fridman's testimony would have benefitted had he been hired earlier and had he been given more time to review Hill's record and background. But, to establish prejudice, Hill needs to do more. In contrast to cases involving a complete failure to investigate or a complete failure to put on any mitigation specialist, the question here is whether the late hiring of a mitigation specialist had a reasonable likelihood

of altering the jury's verdict, particularly when all of the post-conviction-hearing affidavits already relate in one way or another to the mitigation evidence that Hill's attorneys did present. *See Smith v. Mitchell*, 348 F.3d at 202 (finding no prejudice where, other than inconclusive evidence of a brain disorder, defendant "failed to point to any mitigating evidence that was not actually presented"). When examined in the context of cases finding prejudice and declining to find prejudice, we do not think that showing has been made. *Compare Johnson v. Bell*, 344 F.3d 567, 574 (6th Cir. 2003) (finding no prejudice in failure to present testimony by defendant's family members, even though it would have humanized him by showing he had been a good son, brother and parent, because the evidence fell short of the quantum of evidence needed to establish a reasonable likelihood of a different verdict), *Wickline*, 319 F.3d at 821–22 (finding no prejudice where counsel did not present any evidence of defendant's allegedly troubled upbringing, including "devastat[ing]" death of one parent and troubled relationship with other parent), *Williams v. Coyle*, 260 F.3d at 706 (finding no prejudice where "the evidence [the defendant] claims should have been introduced goes to a theory of mitigation that the jury found did not outweigh the aggravating circumstances"), *Allen v. Woodford*, 395 F.3d 979, 1005 (9th Cir. 2005) (finding no prejudice where counsel did not introduce mitigation evidence showing the defendant could be pleasant because that evidence would not have outweighed the aggravating circumstances), *Williams v. Cain*, 125 F.3d 269, 279 (5th Cir. 1997) (finding no prejudice where counsel did not present evidence of defendant's troubled family history, including verbal and physical abuse, because it was unlikely to have a mitigating effect against the aggravating evidence, which included the brutality of the murder, his prior criminal history, the fact he hid evidence and the fact he initially lied to police), *and Frey v. Fulcomer*, 974 F.2d 348, 367–69 (3d Cir. 1992) (finding no prejudice where counsel did not mention every available mitigating factor (the tragic death of defendant's son, defendant's impotence, his deteriorating marriage, his somewhat low IQ and his psychological weakness) because these facts presented no reasonable probability the jury would have balanced the mitigating and aggravating factors differently), *with Wiggins*, 539 U.S. at 535–36 (finding prejudice in a failure-to-investigate case involving new testimony about repeated physical and sexual abuse), *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding prejudice in a failure-to-investigate case where counsel failed to uncover "extensive records graphically describing Williams' nightmarish childhood"), *Coleman v. Mitchell*, 268 F.3d 417, 450–53 (6th Cir. 2001) (finding prejudice where counsel presented no evidence of defendant's personal background, psychological history or potential organic brain dysfunction), *Carter v. Bell*, 218 F.3d 581, 599–600 (6th Cir. 2000) (finding prejudice where counsel performed no investigation and presented no evidence of defendant's illegitimacy, family history, limited education, low and declining IQ, mental condition and positive relationships with children), *Skaggs v. Parker*, 235 F.3d 261, 271–72 (6th Cir. 2000) (finding prejudice when the only mitigation evidence presented came from a fraudulent psychologist, resulting in "the presentation of essentially no mitigating evidence at all," especially concerning defendant's mild mental retardation and diminished mental capacity), *Hardwick v. Crosby*, 320 F.3d 1127, 1167–69, 1173–74 (11th Cir. 2003) (finding prejudice where counsel presented no mitigating evidence of defendant's alcohol and drug intoxication at the time of offense or of his abusive family life), *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002) (finding prejudice where counsel failed to investigate defendant's childhood, mental illnesses, organic brain disorders and substance abuse), *Battenfield v. Gibson*, 236 F.3d 1215, 1234–35 (10th Cir. 2001) (finding prejudice where counsel failed to present any evidence during mitigation phase, including facts surrounding prior felony conviction that suggested the crime was an act of self defense), *Antwine v. Delo*, 54 F.3d 1357, 1368 (8th Cir. 1995) (finding prejudice where counsel failed to investigate fully defendant's mental condition and did not present evidence of defendant's bipolar disorder and the corresponding possibility that he was "in the throes of a manic episode during the offense"), *and Lewis v. Lane*, 832 F.2d 1446, 1457 (7th Cir. 1987) (finding prejudice where counsel stipulated at mitigation hearing to the existence of two prior felony convictions that did not, in fact, exist).

As these cases illustrate, in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing. Here, by contrast, Hill's description of the evidence that a prepared mitigation specialist would have presented resembles the evidence the jury did have before it in weighing the aggravating and mitigating factors. Nothing in this new testimony suggests that it would have stood out to

the jury in such a way as to change the calculation the jury previously made when weighing the aggravating and mitigating circumstances of the murder.

Hill also argues that a better-prepared psychologist would have testified that cocaine addiction qualifies as a mental disease or defect under Ohio law.  But Dr. Sales' and Dr. Hawgood's affidavits—affidavits that Hill presents as examples of well-prepared reports—do not make that point. Neither one concludes that Hill "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law," as Ohio Revised Code § 2929.04(B)(3) defines mental disease or defect.  To say that Hill would not have killed his mother "but for" his intoxication, as Dr. Sales does, JA 3510, is not to say that Hill could not understand that his actions were wrong or that his intoxication prevented him from refraining from murder.  That the experts he holds out as model witnesses fail to make this point undermines his claim that Dr. Fridman would have made the point had he been given more time to prepare for the hearing.

Hill also contends that if his lawyers had timely hired the mitigation specialist, Hill's "mental health issues could have been addressed earlier in the process," which would have helped Hill communicate more productively with his lawyers.  Hill Br. at 44.  But Hill's mental health issues *were* identified early on, as evidenced by the competency hearings long before trial, and Hill did receive treatment as a result.  *See* JA 326 (ordering Hill to the Dayton Forensic Unit for "further evaluation and treatment").

Hill, lastly, argues that Dr. Fridman's limited preparation time hindered his ability to testify about Hill's significant depression while he was in jail awaiting the trial.  Dr. Sales' affidavit, Hill points out, shows that Hill's hallucinations in jail demonstrated not malingering, as many of the psychological reports concluded and as the prosecution tried to demonstrate through its cross-examination of Dr. Fridman, but rather major depression.  As the district court pointed out, however, testimony about Hill's behavior after the offense did not diminish the mitigating effect of the central thrust of Dr. Fridman's testimony—that cocaine played a large part in Hill's behavior at the time of the murder.  D. Ct. Op. (July 24, 2003) at 18–19.

III.

Pointing out that his attorneys failed to provide civilian clothing, as opposed to prison garb, for him to wear at the trial, Hill next argues that this failure amounted to both ineffective assistance of counsel and a violation of due process.  We disagree.

A.

The Ohio Court of Appeals, on collateral review, addressed the ineffectiveness component of this claim in this way:

> In his second assignment, Hill claims he was denied effective assistance of counsel because he appeared in jail garb during his trial.  To support his claim below, he provided an affidavit stating that his attorneys failed to honor their promise to provide him with street clothes for trial, and that he attended trial in jail garb.  He also provided the affidavit of the mother of his child, who confirmed that he attended trial in jail garb.  Hill claims this evidence was sufficient to warrant a hearing on his claim of ineffective assistance of counsel.  We believe Hill's claim could and should have been raised at trial or on direct appeal and, thus, is *res judicata*.

*State v. Hill*, 1998 WL 320917, at *3.

As with his mitigation-psychologist claim, Hill relies on evidence outside the direct-appeal record (affidavits asserting that he was in jail garb during the trial and testimony that his attorneys promised to provide him with civilian clothing) to present this claim.  And as with the mitigation-psychologist claim, the Ohio Court of Appeals' improper application of its res judicata rule does not bar our review, *see Greer*,

264 F.3d at 674–75—nor does the State contend otherwise. Because the state court did not reach the merits of this federal claim, we review the claim de novo. *Maples*, 340 F.3d at 437.

Even if Hill's attorneys erred in failing to provide him with civilian clothing, a point we need not decide, Hill has not shown how the error prejudiced him. In his appellate briefs, Hill does not even address the prejudice prong of *Strickland*, which by itself suffices to reject this claim. *See Wiggins*, 539 U.S. at 521. Nor do we see how he could show prejudice. As the district court explained, the jury learned from the outset of Hill's trial that he had confessed to killing his mother. In the aftermath of Hill's confession, "it tests the limits of credulity to suggest that appearing before the jury in jail garb somehow cloaked petitioner with a veil of guilt" sufficient to present a reasonable probability that Hill would not have been convicted or sentenced to death had he appeared in civilian clothes. D. Ct. Op. (July 24, 2003) at 55.

B.

For somewhat similar reasons, Hill's due-process claim arising from the same incident—his appearance during the trial in jail garb—comes up short. The Ohio Court of Common Pleas, the last court to address this claim, rejected the claim on procedural grounds:

> Petitioner's second claim for relief alleges that he was denied the effective assistance of counsel and due process because he was forced to go to trial in his jail garb. As to this claim, the court makes the following Findings of Fact:
>
> > 1) The record reflects that petitioner did no[t] object to being tried in his jail garb.
> >
> > 2) This claim could have been raised on direct appeal as petitioner was represented by new counsel.
> >
> > 3) No demonstration has been made that, *had* petitioner's counsel secured for Hill alternative clothing, the outcome of his trial would have been different.
>
> Based upon the above Findings of Fact, this Court makes the following Conclusions of law for this claim for relief:
>
> > 1) No constitutional violation is established on this record as defendant did not object to being tried in his jail garb. *Estelle v. Williams* (1976) 96 S. Ct. 1691.
> >
> > 2) This claim [is] barred by res judicata. *State v. Perry*, 10 O.S.2d 175 (1967).
> >
> > 3) No prejudice is demonstrated.
>
> Without a properly documented allegation of prejudice sufficient to show a reasonable probability that the verdict at trial would have been different, a claim of ineffectiveness must be summarily rejected. *State v. Bradley*, 538 N.E.2d 373 (1989); *State v. Kapper*, 448 N.E.2d 823 (1983).

JA 1723–24 (parallel citations omitted).

In attempting to overcome this state-law procedural bar, Hill has not shown how any error, even if it occurred, prejudiced him, which is one of the requirements for circumventing the adequate and independent state-law ground of the state court's ruling. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.

1986) (considering (1) whether the inmate failed to comply with a firmly established state procedural rule, (2) whether the State enforced the procedural rule, (3) whether the failure to comply with the state rule constitutes an adequate and independent ground for the decision and (4) whether the petitioner has demonstrated cause for disregarding the state procedural rule and whether the alleged constitutional error *prejudiced the inmate*). Accordingly, this claim is rejected as well.

## IV.

Hill next raises several challenges to the guilt-phase jury instructions on intoxication and claims ineffective assistance of counsel stemming from his lawyer's failure to establish a meaningful attorney-client relationship. We reject each claim.

## A.

The trial court erred, Hill first asserts, by failing to instruct the jury about intoxication, which under Ohio law may in some circumstances prevent an individual from forming the requisite intent to commit murder. According to Hill, the failure to issue the jury instruction during the guilt phase of the trial deprived him of due process.

The Ohio Supreme Court addressed this claim on direct review:

In proposition of law No. X, Hill argues plain error because the trial court did not, *sua sponte*, instruct the jury to consider Hill's cocaine intoxication in deciding either his guilt or the recommended penalty. . . . We reject [this] proposition[].

First, Hill failed to request any instruction as to the effect of intoxication. Thus, Hill waived all but plain error. *State v. Underwood*, [444 N.E.2d 1332 (Ohio 1983)], at syllabus; Crim.R. 30(A), 52(B). The evidence of Hill's guilt, as well as the evidence supporting the death penalty, negates any claim that "but for the error," the trial result "clearly would have been otherwise." *State v. Underwood*, syllabus.

Second, we have traditionally recognized a trial judge's discretion as to whether to instruct a jury on intoxication as a defense. *See State v. Fox* (1981), 428 N.E.2d 410; *Nichols v. State* (1858), 8 Ohio St. 435, paragraph two of the syllabus. As *Nichols* stated at 439, we will not impose a requirement for a trial judge to so instruct a jury, since "[i]ntoxication is easily simulated" and "often voluntarily induced for the sole purpose of nerving a wicked heart[.]"

Moreover, the evidence does not reasonably raise the intoxication issue. "[I]ntoxication is not raised as a defense to the element of purpose in a criminal prosecution merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." *State v. Hicks* (1989), 538 N.E.2d 1030, syllabus.

In this case, Hill drove away from his mother's house, obtained cocaine, and drove back. Then he stabbed her ten times, searched for and found money, and drove away again. When he left after killing his mother, he locked her door behind him. Then, he took the precaution of discarding the murder weapon. Three days later, he recalled and described the events of the murder to police. His careful, calculated steps refute any claim that cocaine use interfered with his capacity to entertain the purposeful intent to kill. *See State v. Slagle* (1992), 605 N.E.2d 916, 924; *State v. Hicks*, *supra*, 538 N.E.2d at 1034.

*State v. Hill*, 653 N.E.2d at 280–81 (parallel citations omitted).

Applying AEDPA deference (without objection from the parties), the district court decided that the Ohio Supreme Court's decision was not objectively unreasonable. Applying the same standard (again without objection from the parties), we agree. Hill has failed to identify any decision by the Supreme Court holding that the Constitution requires trial courts to give jury instructions on intoxication as a defense to a murder charge, and at least one decision undermines this argument. *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (plurality) (rejecting due-process claim to have the jury consider evidence of defendant's voluntary intoxication); *id.* at 57 (Ginsburg, J., concurring) (rejecting same claim on grounds that a state can decide that those who voluntarily intoxicate themselves are as culpable for committing a proscribed act as those who are "stone sober").

In response, Hill argues that *In re Winship*, 397 U.S. 358 (1970), and *Martin v. Ohio*, 480 U.S. 228 (1987), establish that flawed jury instructions may violate the Due Process Clause of the Fourteenth Amendment. Perhaps so. But nothing in *Winship* or *Martin* requires a jury instruction on intoxication under circumstances like these. *Winship* held only "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. And *Martin* held that *no* due process violation occurs when a jury instruction requires a defendant to prove by a preponderance of the evidence that she acted in self-defense, because the State still must prove the elements of the crime beyond a reasonable doubt. 480 U.S. at 233–34. To the extent Hill means to suggest that the absence of an intoxication instruction establishes that the State failed to meet its burden of establishing the mens rea element of the crime beyond a reasonable doubt, that too is wrong. As the Ohio Supreme Court explained, the State did prove the specific intent element: "[Hill's] careful, calculated steps refute any claim that cocaine use interfered with his capacity to entertain the purposeful intent to kill." *State v. Hill*, 653 N.E.2d at 281.

B.

Nor did Hill's trial attorneys provide ineffective assistance by failing to request jury instructions on intoxication during the guilt phase. The Ohio Supreme Court rejected this claim on the merits:

> We also reject Hill's proposition of law No. XI, claiming ineffective assistance of counsel. Defense counsel need not make fruitless requests for jury instructions, such as those on intoxication. Thus, counsel's decision not to request such instructions reflected professional judgment not falling "below an objective standard of reasonable representation." *State v. Bradley*, [538 N.E.2d 373 (Ohio 1989)], at paragraph two of the syllabus. Hill also failed to demonstrate prejudice. No "reasonable probability" exists that the result of the trial would have been different if counsel had requested such instructions. *State v. Bradley*, at paragraph three of the syllabus.

*State v. Hill*, 653 N.E.2d at 281.

Because the Ohio courts addressed this claim on the merits, AEDPA deference applies. The Ohio Supreme Court's decision is neither contrary to nor an unreasonable application of governing law. The state high court applied the correct standard, as the case upon which it relied, *State v. Bradley*, sets out *Strickland*'s deficient-performance and prejudice inquiries. *See* 538 N.E.2d at 375. And the state court reasonably applied *Strickland* in concluding that the decision not to request an intoxication instruction fell within the range of permissible strategy options available to Hill's trial counsel. During the guilt phase, Hill's counsel chose to contest whether the murder qualified as a felony-murder by arguing that the robbery did not occur at the same time as or in connection with the murder. Had the jury agreed with this theory—had it agreed in other words that felony-murder did not occur—Hill would not have been eligible for the death penalty. *See* JA 3220–25 (closing defense arguments during guilt phase). In choosing to emphasize this strategy and in choosing not to challenge intent, Hill's counsel did not act unreasonably—given the risk that the intent argument would have diminished the focus on the felony-murder contention and given numerous weaknesses in the intent argument. Even assuming that Hill was

intoxicated at the time of the murder, the brutal facts of the case (stabbing the victim ten times, searching immediately for money, locking the door, discarding the murder weapon) placed substantial obstacles in the way of arguing credibly that Hill did not have the requisite intent to kill or the capacity to have such intent. And applicable Ohio law further dimmed the prospects of succeeding with this argument. *See State v. Dennis*, 683 N.E.2d 1096, 1109 (Ohio 1997) (stating that "even severe intoxication can co-exist with purpose to kill"). Because Hill's counsel performed reasonably in making this strategic decision, the Ohio Supreme Court did not err in rejecting Hill's ineffective-assistance claim, much less apply the *Strickland* rule in an objectively unreasonable way. *See Strickland*, 466 U.S. at 689 (noting that "[j]udicial scrutiny of counsel's performance must be highly deferential," warning against "second-guess[ing]" and the "distorting effects of hindsight" and setting out a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

C.

Hill next argues that his attorneys denied him effective assistance by failing to establish the essentials of an attorney-client relationship. The Ohio Court of Appeals considered this claim on post-conviction review and rejected it on res judicata grounds:

> In his first assignment of error, Hill alleges that jail logs reflecting the number of visits by counsel demonstrate[] that counsel failed to provide the attention necessary for a capital case and, thus, that he was denied effective assistance of counsel. To further support this claim below, Hill provided three affidavits: (1) the affidavit of a criminal investigator stating the number of times Hill's counsel visited him in jail; (2) the affidavit of a clinical psychologist who examined Hill after the trial, stating that Hill's counsel failed to develop a strong relationship with Hill, based on the alleged infrequency of visits, and (3) the affidavit of Hill stating that the more he saw and trusted the persons that provided him treatment while he was incarcerated, the more he spoke with them. To the extent that Hill's claim challenges counsel's conduct at trial, it is *res judicata*. To the extent Hill's claim challenges conduct outside the record, the evidentiary material offered to support Hill's claim fails to demonstrate that the failure to visit Hill "more often" rendered the trial fundamentally unfair.

*State v. Hill*, 1998 WL 320917, at *2.

The Ohio court thus rejected this claim on procedural grounds (res judicata) as well as on the merits (based on the affidavits submitted by Hill and based on its conclusion that the trial was not fundamentally unfair). Whether we consider this a claim in which Hill must overcome a procedural default or a claim in which he must overcome the AEDPA standard of review for matters handled on the merits by the state court makes no difference to the resolution of this claim. Either way, Hill would have to establish prejudice arising from the claim, and he has not done so. Even granting Hill the assumption that his relationship with his lawyers was not what it should have been, he has not shown how that failing affected the advocacy they provided him. *See Wheat v. United States*, 486 U.S. 153, 159 (1988) ("in evaluating Sixth Amendment [right-to-counsel] claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such") (quotation marks omitted). Hill has given us no explanation how additional meetings with his counsel, or longer meetings with his counsel, would have led to new or better theories of advocacy or otherwise would have created a "reasonable probability" of a different outcome. Under these circumstances, he cannot establish an essential prerequisite for relief—a showing of prejudice—and accordingly the claim cannot succeed.

V.

We now turn to several claims arising from the mitigation phase of Hill's trial.

A.

Because his attorney failed to request a jury instruction on intoxication as a mitigating factor during the penalty phase of the trial, Hill claims that he was denied effective assistance of counsel. The Ohio Supreme Court rejected this claim on the merits on direct review at the same time that it rejected the comparable claim arising from the guilt phase of the trial that we addressed above.

> In proposition of law No. X, Hill argues plain error because the trial court did not, *sua sponte*, instruct the jury to consider Hill's cocaine intoxication in deciding either his guilt or the recommended penalty. . . . We reject [this] proposition[].

> First, Hill failed to request any instruction as to the effect of intoxication. Thus, Hill waived all but plain error. *State v. Underwood*, [444 N.E.2d 1332 (Ohio 1983)], at syllabus; Crim.R. 30(A), 52(B). The evidence of Hill's guilt, as well as the evidence supporting the death penalty, negates any claim that "but for the error," the trial result "clearly would have been otherwise." *State v. Underwood*, syllabus.

> . . . .

> As to the penalty phase, the trial court fully instructed the jury on sentence deliberations and to consider all of the evidence and arguments presented. The trial court need not instruct the jury to give particular weight to any specific evidence, such as Hill's cocaine use. "The fact that an item of evidence is admissible . . . does not automatically mean that it must be given any weight." *State v. Steffen*, [509 N.E.2d 383 (Ohio 1987)], at paragraph two of the syllabus. Also, Hill did not establish that his cocaine addiction qualified as a mental disease or defect under R.C. 2929.04(B)(3). *See State v. Cooey*, 544 N.E.2d [895,] 919 [(Ohio 1989)]; *State v. Van Hook* (1988), 530 N.E.2d 883, 889–890.

*State v. Hill*, 653 N.E.2d at 280–81 (parallel citations omitted).

AEDPA deference applies, and the Ohio Supreme Court did not unreasonably apply Supreme Court precedent in concluding that Hill's counsel performed adequately. No pertinent holdings of the United States Supreme Court required such an instruction. And the trial court did instruct the jury that it could consider, in addition to a list of specific mitigating factors, "any other factors that are relevant to the issue of whether the offender should be sentenced to death." JA 3405–06. Because the court instructed the jury that it could consider any factor—necessarily including Hill's intoxication—and because federal courts generally "presume that juries follow their instructions," *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000), counsel could reasonably have expected that his decision not to request a specific instruction regarding intoxication would not have changed the jury's deliberations. The Ohio Supreme Court was not objectively unreasonable in rejecting this claim. We accordingly reject it as well.

B.

Hill next brings three related claims concerning the burden of proof that applies to the weighing process of an Ohio capital case, namely the weighing of the aggravating circumstance of the crime against any mitigating factors that might lead a jury to sentence the defendant to life rather than death. First, he argues that misstatements about Ohio law by the prosecutor during the mitigation-phase closing arguments deprived him of due process. Second, he argues that a misstatement of law on the verdict forms deprived him of due process and subjected him to cruel and unusual punishment. Third, he contends that the failure

of his lawyers to object to the prosecutor's statements and to the incorrect verdict forms denied him effective assistance of counsel.

We will review the first two claims together because the Ohio Supreme Court addressed them together, reasoning as follows:

> In propositions of law Nos. I through IV, Hill raises issues centered around his claim that the jury was fundamentally misled concerning the sentencing standard by which aggravating circumstances are weighed against mitigating factors. Yet, Hill did not object at trial to the faulty verdict form or the instructions, and thus waived all but plain error. "The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 444 N.E.2d 1332, syllabus. Overall, we find the instructions adequate under the facts of this case and reject Hill's claims of plain error.

> As Hill correctly points out, the jury must find beyond a reasonable doubt that the "aggravating circumstances" are "sufficient to outweigh" those "mitigating factors present in the case" before recommending the death penalty. R.C. 2929.03(D)(2). Unfortunately, at least one life sentence verdict form used in this case, and possibly both, misstated this standard. Neither life verdict form is in the record. However, the trial judge told the jury that the life sentence verdict form involved the jury's finding that the "mitigating factors are sufficient" to outweigh the aggravating circumstance. Thus, in referring to that form, the trial judge asserted, "The second [form] is we, the jury, do find beyond a reasonable doubt that the mitigating factors are sufficient to outweigh the aggravating circumstances present in this case." Additionally, the court and parties frequently and erroneously referred to "aggravating circumstances" although only one aggravating circumstance was alleged or proved.

> In proposition of law No. II, Hill points out that the prosecutor in argument misstated applicable law by asserting that "mitigating factors do not outweigh the aggravating circumstances." The prosecutor also misspoke by referring to "any mitigating factor" in the singular, and by referring to the jury recommending "death in the electric chair."

> Notwithstanding the prosecutor's misstatements and the inaccurate life sentence verdict form, we deem it unnecessary to reverse this sentencing determination under the circumstances of this case. First, Hill failed to raise these issues before the court of appeals. We "will not ordinarily consider a claim of error that was not raised in any way in the Court of Appeals and was not considered or decided by that court." *State v. Williams* (1977), 364 N.E.2d 1364, paragraph two of the syllabus.

> Second, Hill failed to object at trial. As noted before, failure to object to an instruction waives "any claim of error . . . unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, syllabus. This principle applies equally to the faulty life sentence verdict form. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 372 N.E.2d 804, paragraph three of the syllabus.

> No plain error exists in this case. In fact, the record demonstrates the parties, including the judge in the instructions, generally did refer to a correct standard in the sentence proceedings. Thus, the jury understood the applicable sentencing standard and its sentencing responsibility. The trial court clearly and correctly instructed the jury more than four separate times in final penalty instructions that the aggravating circumstances had to

outweigh mitigating factors before the jury could recommend the death penalty. The court defined the term "reasonable doubt," and specifically told the jury "the defendant has no burden of proof." The court specifically referred once to the state's burden of proof beyond a reasonable doubt that the aggravating circumstances outweighed the factors in mitigation. The court repeated the state's burden of proof beyond a reasonable doubt when reading the death penalty verdict form. The court further told the jury that only if "you are firmly convinced" that aggravating circumstances outweigh mitigating factors has the state proven its right to a death penalty verdict. If the jury was not "firmly convinced" that aggravation outweighed mitigation, then the state was not entitled to a death penalty recommendation.

In voir dire, the prosecutor repeatedly referred to the correct standard. Also, the jury never asked any questions. Moreover, the jury form that the jury agreed to and signed reflected the correct standard: "We, the Jury, in the issue joined, do find beyond a reasonable doubt that the aggravating circumstances [*sic*] present in this case are sufficient to outweigh the mitigating factors and we therefore recommend that the sentence of Death be imposed on the defendant, Jeffrey D. Hill."

When the jury instructions including the verdict forms are viewed in their entirety, the trial judge adequately informed the jury of its responsibility under R.C. 2929.03(D)(2). *State v. Lorraine* (1993), 613 N.E.2d 212, 221. *Accord State v. Landrum* (1990), 559 N.E.2d 710, 727.

Moreover, we find nothing suggesting the aggravating circumstance and mitigating factors are in equipoise in this case. In fact, the aggravating circumstance strongly outweighs the scant mitigating factors beyond a reasonable doubt, as discussed later. In essence, Hill asked the jury and this court to spare his life because he is a cocaine addict and confessed to police. Under those circumstances, the faulty form or instructions could not have affected the jury's decision so that "but for" the faulty form, the "outcome of the trial clearly would have been otherwise." *State v. Underwood*, syllabus.

Further, Hill's failure to object to the prosecutor's argument also waived all but plain error. *State v. Mills* (1992), 582 N.E.2d 972, 986. No plain error resulted because the prosecutor did not deny Hill a fair trial or cause a miscarriage of justice. *State v. Combs* (1991), 581 N.E.2d 1071, 1076; *State v. Landrum*, *supra*, 559 N.E.2d at 717.

The prosecutor's reference to the electric chair was accurate, since the General Assembly had not yet authorized death by lethal injection. *See* R.C. 2949.22, Sub.H.B. No. 11, effective October 1, 1993. The prosecutor's brief misstatements as to "any mitigating factor" and the weighing process were inconsequential. At times, the prosecutor correctly noted that the aggravating circumstance must outweigh mitigating factors to justify the death penalty. Moreover, the court told the jury it was the court's job to instruct the jury on the law, and the jury's duty to follow those instructions. As discussed, the court adequately instructed the jury as to its responsibilities.

Additionally, our independent reassessment of the sentence could eliminate the effect of these errors. *See State v. Combs*, *supra*, 581 N.E.2d at 1079; *State v. Landrum*, *supra*, 559 N.E.2d at 729. Thus, we reject Hill's plain error assertions in propositions Nos. I and II.

*State v. Hill*, 653 N.E.2d at 277–78 (parallel citations omitted).

The district court applied AEDPA deference to the Ohio Supreme Court's decision on these claims, and Hill does not claim that we should do otherwise. Prosecutorial misconduct claims turn on "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416

U.S. 637, 643 (1974)).  The Ohio Supreme Court did not unreasonably apply this rule in rejecting Hill's claim.

> The mitigating factors do not outweigh the aggravating circumstances.  He's guilty of aggravated murder, guilty of the aggravating circumstance.  Therefore beyond any reasonable doubt the aggravating circumstance does outweigh any mitigating factor.  You've got to follow the law which is you shall recommend death in the electric chair.

JA 3396.  While the prosecutor misstated Ohio law when he suggested that the mitigating factors had to outweigh the aggravating circumstance and misstated the facts when he referred to "aggravating circumstances"—as there was only one aggravating circumstance, namely that Hill committed the murder while engaging in a felony—these mistakes did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.  Nothing in the record suggests that the misstatements were intentional, and the error plainly was a de minimis one given the many times the prosecutor correctly stated the standard—including in the remaining sentences of the above block quotation.

Nor did the misstatement in the verdict form deny Hill due process.  The issue here is not whether the form misstated state law, for "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).  The issue is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72.  And "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naugthen*, 414 U.S. 141, 147 (1973)).

Measured by these requirements, the Ohio Supreme Court did not act unreasonably in concluding that the jury properly understood and applied the correct law, especially in view of the trial judge's many recitations of the correct standard to the jury.  *See State v. Hill*, 653 N.E.2d at 277–78; *see also* JA 3396–408 (sentencing jury charge, which states the correct burden six times).  Because the jury instructions, both in the jury's signed verdict form and as explained orally by the judge six times, were correct, any error did not so infect the entire trial as to deny Hill due process.

As for Hill's argument that the errors on the verdict form subjected him to cruel and unusual punishment, Congress has not given us authority to address that claim.  "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from [ ] the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1).  And the certificate must "indicate which specific issue or issues" show the denial of a constitutional right. *Id.* § 2253(c)(3).  Because the certificate does not raise an Eighth Amendment claim on this point, Hill may not appeal the issue.

C.

In his third claim relating to the burden of proof applicable to the aggravation-mitigation weighing process, Hill asserts that his attorneys' failure to object to these misstatements of law amounted to ineffective assistance.  The Ohio Supreme Court rejected this claim as well as one other that is not before us:

> In propositions of law Nos. III and IV, Hill asserts he was denied the effective assistance of counsel at trial and before the court of appeals.  In proposition No. III, Hill complains because his counsel did not object at trial to the verdict form or the prosecutorial misstatements, as discussed in propositions Nos. I and II. . . .

Reversal of a conviction or sentence based on ineffective assistance requires meeting the two-prong standard of *Strickland v. Washington* (1984), 466 U.S. 668. *Strickland* requires: (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice, "errors . . . so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* at 687. *Accord State v. Bradley* (1989), 538 N.E.2d 373.

However, Hill fails to demonstrate either deficient performance or prejudice. Hill's counsel reasonably decided not to object to the prosecutor's brief, inaccurate comments. Objections "'tend to disrupt the flow of a trial [and] are considered technical and bothersome[.]'" *State v. Campbell* (1994), 630 N.E.2d 339, 352. A decision not to interrupt because of such imprecise statements reflected "an objective standard of reasonable representation." *See State v. Bradley*, at paragraph two of the syllabus. Also, counsel could have believed the trial court's more than four correct references to the aggravating circumstances outweighing the mitigation factors negated these misstatements.

As to the incorrect life verdict form or forms, all parties to the trial, including the two defense counsel, apparently overlooked that deficiency. Such an oversight is "not the kind of egregious and unprofessional conduct condemned by *Strickland*." *State v. Seiber* (1990), 564 N.E.2d 408, 417. *Accord State v. Scudder* (1994), 643 N.E.2d 524, 533. Overall, counsel's conduct fell within the wide range of reasonably professional conduct, and his counsel continued to function as the counsel guaranteed by the Sixth Amendment.

Additionally, Hill has not established prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, at paragraph three of the syllabus. In fact, the aggravating circumstance strongly outweighs the scant mitigating factors beyond a reasonable doubt, as discussed later. Thus, even if counsel had objected and thereby secured a correct verdict form or eliminated the prosecutor's misstatements, no reasonable probability exists as to a different result.

*State v. Hill*, 653 N.E.2d at 278–79 (parallel citations omitted).

Because the Ohio Supreme Court rejected this claim on the merits, AEDPA deference applies. The Ohio Supreme Court reasonably applied the *Strickland* test in rejecting this claim. Given the overall context of the trial and the number of times counsel and the court explained the correct standard to the jury, Hill's counsel's failure to object to the incorrect verdict forms did not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

D.

Hill next argues that his lawyers failed to raise in mitigation the fact that he had adjusted well to prison. After Hill raised this claim during his state post-conviction proceedings, the Ohio Court of Appeals rejected it on the merits:

In his seventh assignment of error, Hill relies upon a psychologist's proffered opinion about his adjustment to jail to support his argument that he was denied effective assistance because there was no evidence presented at trial to demonstrate his adjustment to jail and his amenability to incarceration. This claim has no merit. The record of the murder trial reflects that Dr. Fridman testified that Hill was a proper subject for rehabilitation.

*State v. Hill*, 1998 WL 320917, at *4.

Assessing counsel's performance under *Strickland* and through the prism of AEDPA, we conclude that no deficient performance or prejudice has been shown. Counsel did not, as Hill contends, fail to put

on any evidence of Hill's ability to adjust to prison life. Dr. Fridman, Hill's mitigation specialist, testified at the mitigation hearing that Hill was "a proper subject for rehabilitation while in a jail setting for the rest of his life." JA 3353. In support of this conclusion, Dr. Fridman testified that Hill would overcome his crack cocaine addiction while in prison (and while necessarily without access to the drug) and emphasized that Hill committed the murder both while intoxicated by cocaine and for the purpose of supporting his cocaine habit, all of which showed that he would not be a danger to others while in prison. Hill's counsel, in short, did not fail to present this mitigating factor to the jury.

Hill persists that the following section of Dr. Hawgood's affidavit illustrates how Dr. Fridman's testimony could have been more forceful on this point:

> It is my opinion that Mr. Hill would function well in the future in the prison environment because of his unrelenting self-monitoring and self-abnegation. He would most likely never [be] a threat to himself or to others. He accepts criticism or rejection from others as his just due, as part of the atonement process. He has come to accept lack of contact from various family members, his brother included, as just punishment for the crime he committed. His "good" behavior has kept him on level A since the beginning of his incarceration on death row.

JA 1549. But to the extent Dr. Fridman could have highlighted the point more clearly or more forcefully by mentioning past good behavior, our earlier discussion of prejudice arising from Dr. Fridman's lack of preparation time, *see Smith v. Mitchell*, 348 F.3d at 200 ("We find no cause or prejudice under *Strickland* because *all of this evidence was presented at mitigation*."), suffices to reject this claim as well.

Nor does *Skipper v. South Carolina*, 476 U.S. 1 (1986), lead to a different conclusion. *Skipper* concluded that a trial court's exclusion of testimony regarding good behavior could deprive a defendant of his right to present mitigating factors and arose in a setting in which the prosecutor had "made much of the dangers petitioner would pose if sentenced to prison, and went so far as to assert that [the defendant] could be expected to rape other inmates." *Id.* at 8. Here, in contrast, the trial court did not exclude the evidence, and the jury did hear testimony about Hill's capacity to adjust to prison and the elimination of the source (cocaine addiction) of his anti-social behavior.

E.

Hill next contends that his lawyers failed to provide effective assistance by not presenting the testimony of additional family and friends during the mitigation proceeding. On post-conviction review, the Ohio Court of Appeals rejected this claim:

> In his fifth assignment of error, Hill claims that he was denied effective assistance of counsel when, in the mitigation phase of the proceedings, counsel failed to provide information about Hill's background through testimony of his relatives and friends. The evidence offered below *dehors* the record discussed, in part, his mother's alleged mistreatment of Hill, Hill's desire to improve his relationship with his mother, and Hill's brother's previous assault on his mother. The mitigation strategy pursued by Hill's counsel focused on his addiction. The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy. The proffered evidence failed to demonstrate ineffective assistance of counsel. Thus, the trial court correctly determined this claim did not warrant a hearing.

*State v. Hill*, 1998 WL 320917, at *3 (footnotes omitted).

AEDPA deference applies to the Ohio Court of Appeals' resolution of this *Strickland* claim on the merits. During the mitigation phase, Hill's attorneys introduced nine medical and background reports examining Hill's mental health, two of which included input from Hill's family members and friends. *See*

JA 332 (listing contacts with Hill's brother, godmother, a cousin named Alicia Sanders, and a friend of the family); JA 382 (relying on notes from a social worker's contacts with Hill's brother and Sanders). Whether learned from these contacts or from Hill himself, the reports discussed several mitigating factors arising from Hill's background and childhood, including his mother's practice of disciplining her children with belts and extension cords and his father's frequent absences during his childhood. When Hill took the stand, he testified that he dropped out of school to help take care of his mother following her stroke and that he cooked for her and helped bathe her. He explained that he worked with handicapped children for a year, and he discussed how the death of his father led him to turn to crack. In addition to Hill's testimony, Dr. Fridman testified as a mitigation specialist, based in part on information he gained by reviewing most of the psychological reports. Hill's attorney also put Shawonar Head, the mother of Hill's daughter, and Robin Hill, Hill's cousin, on the stand. Head testified about their daughter and that Hill had provided financial support for Head and the child (who was five years old at the time of the testimony) since his daughter's birth. The cousin testified that she had never known Hill to use cocaine and agreed that Hill was supportive of his child.

In response to the extent of the evidence that his counsel introduced on this topic, Hill relies on a number of affidavits containing the statements of additional family and friends. But at the outset,

> we note that the cases where this court has granted the writ [of habeas corpus] for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001) (quotation marks omitted). A review of the affidavits produced in support of Hill's habeas petition shows that they present additional detail about his family background as well as a number of positive statements about his character and how he loved his mother and would not have killed her but for the influence of cocaine. But nothing in this new testimony differs markedly from the testimony and evidence the jury in fact considered and above all does not differ in such a material way as to establish that Hill was prejudiced by the omission of this testimony. *See Johnson v. Bell*, 344 F.3d at 574 (finding no prejudice in failure to present testimony by defendant's family members, even though it would have humanized him by showing he had been a good son, brother and parent, because the evidence fell short of the quantum of evidence required to show prejudice). And the additional claim that Hill attempts to present to us—that counsel did not interview the witnesses who were presented—did not receive a certificate of appealability and accordingly is not properly before us. Under these circumstances, the Ohio ruling was not contrary to or an unreasonable application of clearly established federal law.

F.

Hill next argues that because the trial court instructed the jury about all of the mitigating factors specified by the applicable Ohio statute, instead of instructing them only about the mitigating factors he raised (as a prior Ohio Supreme Court decision required), his death sentence violates due process and his right to be free from cruel and unusual punishment. The Ohio Court of Appeals on direct review (the last state court to reach the issue) rejected this claim:

> Hill, in his second assignment of error, argues that during the penalty phase, the trial court erred by instructing the jury on all statutory mitigating factors—including those that he did not raise. *See* R.C. 2929.04(B). He claims that instructing the jury on all seven enumerated factors, when he had raised only three, permitted the jury to convert the absence of proof on the other four factors into an unrecognized and impermissible aggravating circumstance.

In *State v. DePew*, the Supreme Court of Ohio held that: "Those factors not raised [by the defendant] may not be referred to or commented upon by the trial court or the prosecution. . . . Such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant." 528 N.E.2d at 557.

The *DePew* court, nonetheless, indicated that while the trial court should not have read the full list of mitigating factors, because it had made no additional comment on the factors not present, there was no prejudicial error. *Id.*

Here, as in *DePew*, the trial court accurately recited to the jury each statutorily recognized mitigating factor. The only additional comment on absent factors is found in the trial court's remarks immediately prior to reciting the list of statutory mitigating factors. The trial court noted, "The statute provides certain mitigating factors, some of which may not apply to this hearing." We find no error in this parenthetical comment. *State v. Slagle*, 605 N.E.2d at 930. We, therefore, find no prejudicial error in any of the court's comments.

*State v. Hill*, 1993 WL 538902, at \*7–8 (parallel citations omitted).

Because the Ohio Court of Appeals decided this issue on the merits and indeed Hill does not argue otherwise, AEDPA deference applies. The right to have certain statutory mitigating factors considered (or aggravating ones ignored) is a creature of state statute, not the federal Constitution. *See Zant v. Stephens*, 462 U.S. 862, 878–79 (1983) ("[T]he Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class [of defendants defined by the legislature], those defendants who will actually be sentenced to death."). And the fact that an "instruction was allegedly incorrect under state law is not a basis for habeas relief" by itself, *Estelle*, 502 U.S. at 71–72; it is only when the error of state law "so infected the entire trial that the resulting conviction violates due process," *id.* at 72.

In this instance, even if the trial court erred in setting out Ohio statutory law—which is debatable, *see State v. Hill*, 653 N.E.2d at 280 (applying *DePew* and finding no prejudicial error in an analogous case, namely when "the trial court's sentencing *opinion* [as opposed to jury instruction] justified the death sentence by noting the absence and irrelevance of certain statutory mitigating factors") (emphasis added)—the error does not provide a basis for federal habeas relief. The other mitigating factors mentioned in the statute are of course generally lawful factors for a sentencing jury to consider, and their brief mention here did not "so infect[] the entire trial that the resulting conviction violates due process," *Estelle*, 502 U.S. at 72—particularly since the prosecution did not argue that the jury should draw negative implications from Hill's failure to seek relief under certain statutory mitigating factors and since Hill at any rate relied on a significant percentage of the statutory mitigating factors. In the final analysis, the Ohio Court of Appeals did not unreasonably apply clearly established federal law in rejecting this claim.

### G.

Hill next argues that both the trial court and the intermediate appellate court erred by considering the nature of the offense as an aggravating factor, in spite of the fact that the statute does not list it as one, and that this error deprived him of due process and his rights under the Eighth Amendment. The Ohio Supreme Court disagreed:

In propositions of law Nos. V and VI, Hill argues the trial court, in its sentencing opinion, and the court of appeals, in its reassessment of the sentence, considered nonstatutory aggravating circumstances and ignored valid mitigation. We find no merit in either claim.

Neither the trial court nor the court of appeals relied upon nonstatutory aggravating circumstances. Both courts accurately identified the single aggravating circumstance. When a court does so correctly, that court is presumed to rely only on that circumstance, and not

on nonstatutory aggravating circumstances. *State v. Rojas* (1992), 592 N.E.2d 1376, 1386; *State v. Wiles* (1991), 571 N.E.2d 97, 120. Neither the court of appeals' description of Hill's crime as "heinous," nor the trial court's alleged "disgust" for Hill's offense, created nonstatutory aggravating circumstances. The facts of the robbery form part of the aggravating circumstance. *State v. Lott* (1990), 555 N.E.2d 293, 305. Moreover, a court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 512 N.E.2d 598, paragraph one of the syllabus.

As to mitigation, "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, *supra*, 555 N.E.2d at 305. The fact mitigation evidence is admissible "does not automatically mean it must be given any weight." *State v. Steffen* (1987), 509 N.E.2d 383, paragraph two of the syllabus. *See, also*, *State v. Stumpf*, *supra*, at paragraph two of the syllabus. The trial court could reasonably assign whatever weight, if any, [it] thought to be appropriate for Hill's drug dependency or cooperation with police.

In discussing and evaluating the evidence, both the trial court and the court of appeals adequately explained why the aggravating circumstance outweighed any relevant mitigating factors. Even inadequate explanations do not require reversal. *State v. Fox* (1994), 631 N.E.2d 124, 131; *State v. Lewis* (1993), 616 N.E.2d 921, 925. Moreover, our independent reassessment can cure this asserted sentencing deficiency. *State v. Fox*, 631 N.E.2d at 131; *State v. Combs*, 581 N.E.2d at 1079; *State v. Maurer* (1984), 473 N.E.2d 768, 778.

*State v. Hill*, 653 N.E.2d at 279–80 (parallel citations omitted).

AEDPA, the parties agree, governs our review of this decision. In *Zant*, the Supreme Court explained that

statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

462 U.S. at 878–79 (footnote omitted). At most, in other words, a jury that considered aggravating factors beyond those defined by the statute would be violating state law, which establishes a federal constitutional claim only when the state-law error "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Here, however, no error occurred under state law, as explained by the Ohio Supreme Court, and accordingly neither did any error occur under the Federal Constitution. Even if a state-law error had occurred, moreover, the Ohio Supreme Court's reweighing of the aggravating and mitigating factors would cure the error, and indeed Hill does not argue that the Ohio Supreme Court's reweighing suffered from any defects.

## VI.

Hill, finally, challenges the district court's rejection of four other claims: (1) that the state trial court violated his due process rights under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment by ordering him to be medicated during the trial; (2) that by relying on psychologists to evaluate Hill's competency to stand trial, as opposed to psychiatrists (who would have had greater medical expertise to appreciate the medications that Hill was forced to take), the state court violated his rights to due process and to be free from cruel and unusual punishment; (3) that his

counsel failed to provide effective assistance by failing to advise Hill of the consequences of taking the stand during the mitigation hearing and by failing to submit an unsworn statement instead; and (4) that he received ineffective assistance because his counsel failed to establish a mitigation theory in advance of voir dire and as a result was not able to select a jury with that theory in mind.

In presenting these arguments, however, Hill has failed to come to grips with the district court's decisions on each of these points. In rejecting these claims, the district court did not address the merits of the claims but instead dismissed the claims as procedurally defaulted. JA 241–42, 242–43, 3451, 240. Nonetheless, in his briefs on appeal, Hill does not challenge the district court's rulings on procedural default, *see* Hill Br. at 99–101, 101–104, 32–35, 60, but argues only the merits of the claims. Under these circumstances, he has waived his right to challenge these components of the district court's decision. *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) (explaining, in a death penalty case, that "[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quotation marks omitted); *Hutchison v. Bell*, 303 F.3d 720, 748 n.7 (6th Cir. 2002) (concluding, in a death penalty case, that defendant's "other claims of ineffective assistance of counsel have not been adequately briefed. Hence, we find them to be waived."). Nor may we reach contentions Hill raises in connection with the fourth of these claims—that counsel did not have any plan for investigation or for mitigation and that counsel were deficient for failing to make opening statements at either phase of the trial—because they were not certified for appeal.

VII.

For these reasons, we affirm.